**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ELIZABETH E. SMITH,
Plaintiff-Appellee,

v.

ROBERT G. PEPERSACK, SR.; J.

PATRICK OGLE; ANNE ARUNDEL
COUNTY SHERIFF'S OFFICE; ANNE
ARUNDEL COUNTY, MARYLAND,
Defendants-Appellants.

No. 98-1842

ELIZABETH E. SMITH,
Plaintiff-Appellant,

v.

ROBERT G. PEPERSACK, SR.; J.

PATRICK OGLE; ANNE ARUNDEL
COUNTY SHERIFF'S OFFICE; ANNE
ARUNDEL COUNTY, MARYLAND,
Defendants-Appellees.

No. 98-1843

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CA-95-2203-MJG)

Argued: May 6, 1999

Decided: September 24, 1999

Before NIEMEYER, LUTTIG, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Richard Bruce Rosenblatt, Assistant Attorney General, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, Baltimore, Maryland; John Francis Breads, Jr., Senior Assistant County Attorney, OFFICE OF LAW, Annapolis, Maryland, for Appellants. William Michael Ferris, KRAUSE & FERRIS, Annapolis, Maryland, for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, Baltimore, Maryland; Phillip F. Scheibe, County Attorney, OFFICE OF LAW, Annapolis, Maryland, for Appellants.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

On the claim of Elizabeth Smith, a deputy sheriff in Anne Arundel County, Maryland, based on gender discrimination and sexual harassment, filed against Robert Pepersack, former Sheriff of Anne Arundel County, and J. Patrick Ogle, former Undersheriff, a jury returned a verdict in favor of Smith in the total amount of $30,100. On the defendants' appeal challenging the sufficiency of the evidence and Smith's cross-appeal challenging the district court's dismissal of Anne Arundel County and the adequacy of damages, we affirm.

I

Elizabeth Smith graduated second in her class at the police academy and was hired as a deputy sheriff in Anne Arundel County in

2

1988. Before that, she served four years in the military, including three years in the Military Police Force. When she became a deputy sheriff in 1988, she was one of three female deputies in a 25-30 member department, and she was the first deputy hired under the County's merit system.

In November 1990, Robert G. Pepersack was elected Sheriff of Anne Arundel County, and he appointed J. Patrick Ogle as his Undersheriff. Beginning several months later, Smith began to experience comments and adverse treatment by Pepersack and Ogle which she claims were based on her gender. Smith contends that this conduct continued until 1994 when Pepersack lost his bid for re-election.

On July 28, 1995, Smith filed this action under 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C.§ 2000e-5, and Maryland state law,[1] alleging gender discrimination and sexual harassment and naming as defendants Pepersack, Ogle, Anne Arundel County, and "the Sheriff's Office of Anne Arundel County." The district court dismissed the "Sheriff's Office of Anne Arundel County" because, under Revene v. Charles County Commissioners, 882 F.2d 870 (4th Cir. 1989), the "Sheriff's Office" was not an entity capable of being sued. It also granted Anne Arundel County's motion for summary judgment because Smith had not alleged "any direct actions on the part of the County," and the County was not an "employer" of the deputies as required by Title VII because under Maryland law the Sheriff's office is a "hybrid entity, with ties to both the State and the county in which it is located." The court also determined that the County could not be liable under § 1983 because the Sheriff acted on behalf of the State rather than the County in making personnel decisions, and even if the Sheriff acted for the County, Smith had not shown that he had the requisite final policymaking authority.

Plaintiff attempted to keep the County in the suit by filing a motion for reconsideration and a motion seeking leave to amend her complaint to add allegations specific to the County's relationship with the Sheriff and deputies, but the court denied both motions. It concluded first that reconsideration was not warranted because the affidavit

_____

[1] Because Smith voluntarily dismissed the state law claims at trial, they are not relevant to this appeal.

Smith submitted to establish the County's role in hiring deputies was based on information that had been "readily available" to her when the County filed its summary judgment motion. Accordingly, the court found that the proposed amendments to the complaint were "entirely unnecessary and justice would not be served by granting leave to amend."

The case proceeded to trial against the two remaining defendants, Pepersack and Ogle, and Smith presented the following evidence against them, covering a period from 1991 through 1994.

In September 1991, Smith witnessed Ogle loudly berate an officer in her chain of command for an alleged breach of courthouse security. After Smith met with Pepersack several days later, at his request, to discuss the incident, Ogle accused Smith of jumping the chain of command and told her that "[she] would learn not to f--- with him. That he would make [her] life miserable, and that [she] would learn who the boss was in the Sheriff's office."

Later in the fall of 1991, when Smith, as the Officer-in-Charge in the lockup area, was working with a trainee, she released an inmate who should not have been released based on an undiscovered error by the trainee. According to Smith, when Ogle arrived on the scene, he laughed at her and said "I got you now, Ms. Smith." As a result of the incident, Smith was stripped of her "sergeant stripes" and told she was being transferred. Smith testified that Ogle told her to "be a good girl and go over to [Domestic Relations] and to do a good job and he would give me my sergeant stripes back when I learned how to act more like a man."

While Smith was working in the Domestic Relations department, Pepersack and Ogle closely monitored her performance through her supervisor. She characterized her working environment as follows:

> I was starting to realize that no matter what I did, no matter how hard I worked, that it wasn't going to make any difference in their eyes. That the work environment had become so unpleasant. Their comments were demeaning. Their stance when they would talk to you, it was very unpleasant

4

and very uncomfortable, I had never been in an environment like that before.

Once, when Ogle saw Smith take her wallet out of her pants pocket, he remarked that it was "obvious" she wanted to be a man because she carried a wallet.

In the spring of 1993, when Smith was an acting lieutenant, she applied for one of two open lieutenant positions. Because deputies were part of the County's merit system, the county personnel office compiled a list of qualified candidates, ranking them in accordance with the results of tests and interviews, and submitted it to the Sheriff. Although the Sheriff was entitled to promote from the list in his discretion, the Sheriff's general practice was to promote in order from the top of the list. At that time, Smith was ranked third on the list, and Pepersack promoted the two (male) individuals ranked ahead of her.

Smith then arranged a meeting with Pepersack to determine how to better her chances for promotion. As Smith left the meeting, Ogle accosted her and told her that her visit to Pepersack was "exactly why she would never get promoted" because "all[she] did was whine and cry like we women do" and that she did not know how to "take it like a man."

When the next round of promotion opportunities was announced in August 1993, Smith again applied. This time, she was ranked first on the County's merit list. Nevertheless, Pepersack promoted two male deputies ranked below her, one of whom had recently been required to complete sensitivity training as a result of an earlier sexual harassment investigation. Pepersack testified that he did not promote the plaintiff because she only performed well when she liked her task. Her official evaluations, however, were all 1's and 2's, with 1 being the highest score on a 4-point scale. Her evaluations also included additional notations that her performance in various areas was "outstanding" and "significantly better than the standard."

Ogle brought Smith the news that she had been bypassed for the promotion even though she was ranked first on the County's promotion list. When Smith mentioned the top-down promotion custom, Ogle responded that he was the boss, she was not getting promoted,

5

and she should "stop whining and crying and take it like a man." Ogle admonished her to be a "good girl" and "keep [her] mouth shut," and he would consider a future promotion.

Several months later, in April 1994, Ogle transferred Smith from the Administration Bureau (where she had been acting supervisor while the supervisor was away on a three month assignment) to the Warrant Squad. In May 1994, on orders from Captain Nelson, the head of the Warrant Squad, Lieutenant Czorapinski informed Smith that she was to be the "first through the door" on every warrant served. Czorapinski testified that when Nelson gave him the order, he thought it "odd" and "very peculiar," but that Nelson specifically told him that it was "what Ogle wanted." He also testified that there was joking that Smith was prone to getting hurt and that Nelson and Ogle had a bet on how long it would take her to get hurt in the Warrant Squad. Although service of warrants had rarely resulted in injury, being first through the door was the most vulnerable and dangerous position, and Smith interpreted Nelson's order as intending to cause her physical harm.

On consideration of this evidence, the jury returned a verdict in favor of Smith on both questions posed on the special verdict sheet: (1) whether plaintiff proved gender discrimination in the terms and conditions of her employment and (2) whether plaintiff proved the existence of a hostile work environment. The jury found specifically that gender played a motivating role in denying her a promotion. The jury awarded Smith $5,100 in compensatory damages against Pepersack and Ogle, jointly and severally, and $25,000 in punitive damages, $12,500 against each defendant.

The district court denied the defendants' motion to alter or amend the judgment for insufficiency of the evidence, as well as the plaintiff's motion for a new trial on damages.

Both parties have appealed.

II

On their appeal, the defendants contend that the evidence was insufficient to support the jury's finding of gender-based discrimina-

tion, the jury's finding of a hostile work environment, and the jury's award of punitive damages.

In reviewing a judgment for the sufficiency of evidence, we "view the evidence in the light most favorable to the party against whom the motion is made, giving that party the benefit of all reasonable inferences from the evidence. We may not weigh the evidence, pass on the credibility of the witnesses, or substitute our judgment of the facts for that of the jury." Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 351 (4th Cir. 1994) (internal quotation marks and citation omitted). We review de novo the denial of a motion for judgment as a matter of law. See Konkel v. Bob Evans Farms, Inc., 165 F.3d. 275, 279 (4th Cir. 1999).

As an initial matter, we agree with the defendants that if the jury verdict is to stand, it must be on the basis of 42 U.S.C. § 1983 rather than Title VII. Smith sued Pepersack and Ogle in their individual capacities and not their official capacities, and therefore they can only be Smith's supervisors and not her "employer" under Title VII. As we have held, "supervisors are not liable in their individual capacities for Title VII violations." Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 180 (4th Cir. 1998). As defendants concede, however, if Smith demonstrated the existence of intentional gender discrimination unrelated to the needs of her position or the existence of what would constitute a hostile work environment under Title VII, she would establish a violation of the Fourteenth Amendment which could be remedied under § 1983. See Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir. 1994).

Considering the evidence in the light most favorable to Smith, we conclude that the jury had sufficient evidence to determine that Smith was intentionally denied the August 1993 promotion based on gender in violation of the Fourteenth Amendment. When Smith applied for the promotion, she was ranked first on the list that the County compiled. Contrary to Pepersack's testimony that her performance was "lacking," Smith's evaluations were consistently all 1's and 2's, and they included extra commentary by her supervisors noting her "outstanding" performance. In addition, Smith testified that the Sheriff's usual practice was to promote from the top of the list, even though he technically had the discretion to do otherwise. In fact, in the prior

7

round of promotions, Smith did not receive a promotion because the Sheriff adhered to this policy and promoted the two individuals ranked ahead of her on that list.

Despite these objective indicators of Smith's merit and despite the Sheriff's usual promotion practice, Smith was bypassed for a promotion when Pepersack chose to promote two male deputies ranked below her on the list. Moreover, when Ogle approached Smith to break the news that she had been passed over, he continued his pattern of gender-based remarks, chastising her to "stop whining and crying and take it like a man" and to be a "good girl" and "keep [her] mouth shut," and he would consider a future promotion. These comments matched other comments made by Ogle in conjunction with employment decisions that affected Smith. When she was denied the earlier promotion, Ogle told her that she would never get promoted because "all [she] did was whine and cry like . . . women do," and she needed to learn to "take it like a man." When she was transferred to the Domestic Relations department after an error occurred on her watch in the lockup, Ogle announced that if she were "a good girl," maybe she could get her sergeant stripes back. If the jury chose to credit Smith's testimony, it had ample evidence from which to conclude that the denial of the promotion was improperly motivated by gender. Therefore, we must sustain the jury's verdict under § 1983.

III

The defendants also argue that punitive damages were unjustified because, apart from the evidence that supported the violation itself, Smith failed to show sufficient evidence of malicious conduct.

Because, as defendants themselves have argued, liability in this case can only rest on 42 U.S.C. § 1983, rather than Title VII, we look to § 1983 for the appropriate punitive damages standards. The Supreme Court held in Smith v. Wade, 461 U.S. 30, 56 (1983), that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." (Emphasis added); see also Cooper v. Dyke, 814 F.2d 941, 948 & n.5 (4th Cir. 1987) (noting that the Supreme Court in Smith "specifically held that there

8

is no requirement that the standard for punitive damages be higher than the standard for determining liability"). Moreover, in considering the circumstances under which punitive damages are appropriate in the Title VII context under 42 U.S.C. § 1981a(b)(1), the Supreme Court recently reaffirmed the vitality of Smith , applied it to the § 1981 context because Congress relied on Smith in drafting §1981, and elaborated on the meaning of the terms "malice" and "reckless indifference." See Kolstad v. American Dental Ass'n , 119 S. Ct. 2118, 2124 (1999) (observing that the "terms `malice' or`reckless indifference' pertain to the [defendant's] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination"). Rejecting the conclusion that "eligibility for punitive damages can only be described in terms of [a defendant's] `egregious' misconduct," the Court in Kolstad held that"[t]he terms `malice' and `reckless' ultimately focus on the actor's state of mind," making a showing of egregious or outrageous discrimination unnecessary. Id. Thus, because the jury's finding of a constitutional violation under § 1983 necessarily encompasses a finding of intentional discrimination, Smith need not also demonstrate, as defendants suggest, that the conduct was particularly egregious or malicious.

The Court in Kolstad did observe that the mere existence of a civil rights violation is not a guarantee of eligibility for punitive damages because a defendant might not be aware of the federal law he violated or he might have honestly believed that the discrimination was permissible. See id. at 2125. These exceptions, however, do not apply to either Pepersack or Ogle in this case. They simply cannot argue that they were unaware of the federal prohibition of sex discrimination in the workplace. Nor have defendants contended that, while they did deny Smith a promotion because she was female, the denial was justified for a legitimate, work-related reason. Because the jury had enough evidence from which to conclude that both defendants were involved in the decision to deny the promotion and both were motivated by gender, plaintiff has adduced sufficient evidence to demonstrate "reckless or callous indifference" to federally protected rights and to permit the jury to award punitive damages. **2**

_____

**2** The defendants rely heavily on Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 765-66 (4th Cir. 1998) (interpreting 42 U.S.C. § 1981 to

9

IV

On her appeal, Smith contends first that the district court improperly dismissed the County as a defendant. We disagree. In attempting to establish municipal liability under § 1983, Smith did not allege an official policy or custom which led to the discriminatory conduct towards her. Nor did she allege specific facts in opposition to summary judgment that demonstrated that either Pepersack or Ogle was a final policymaker for the County in personnel matters. Similarly, as to the Title VII claim, Smith failed to submit, in a timely fashion, affidavits or other materials to generate a question of fact as to whether the County's exercise of authority and control over employment of deputies was sufficient to establish the County as her "employer" for Title VII purposes. See Fed. R. Civ. P. 56(e).

Smith also challenges (1) the district court's denial of her motions to reconsider the summary judgment in favor of the County and to permit her to amend her complaint; (2) the district court's response to a question from the jury as to who would pay the judgment; and (3) the district court's denial of her motion for a new trial because of an inadequacy of damages. After considering the record and Smith's arguments on each of these contentions, we find them without merit.

Accordingly, the judgment of the district court is

AFFIRMED.

_____

require the plaintiff to show malice beyond that required for the civil rights violation itself in order to be entitled to punitive damages). We note, however, that the Supreme Court has granted certiorari, vacated the judgment in Lowery, and remanded to this court for further consideration in light of Kolstad. See Lowery, No. 98-972, 67 U.S.L.W. 3409 (June 24, 1999).

10